IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EYLEM TOK, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 25-CV-10649-ADB |
| | ) | ***Leave to file oversized brief*** |
| BRIAN A. KYES, United States Marshal, | ) | ***granted March 28, 2025*** |
| District of Massachusetts, | ) | |
| Respondent | ) | |

## GOVERNMENT'S MOTION TO DISMISS OR TRANSFER
## EYLEM TOK'S PETITION FOR HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

The Republic of Türkiye ("Türkiye") seeks the extradition of Eylem Tok pursuant to the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty"), so that she may be prosecuted on the charges of Destroying, Concealing or Altering Evidence, in violation of Article 281 of the Criminal Code of Türkiye, and Protecting an Offender, in violation of Article 283 of the Criminal Code of Türkiye. Tok is accused of assisting her then 16-year-old son, "T.C.," to flee Türkiye immediately after he caused a fatal car crash. T.C., who is also sought for extradition to Türkiye, allegedly killed one person and injured four others when he drove his vehicle at an excessively high rate of speed around a corner late at night on March 1, 2024. Within hours of the crash, Tok and T.C. had purchased airline tickets and fled Türkiye for the United States, via Cairo, Egypt.

On February 11, 2025, Chief U.S. Magistrate Judge Donald L. Cabell issued a 50-page Order denying Tok's motions to dismiss and for release from custody and holding that he would certify her extradition to the Secretary of State. Tok now seeks habeas relief under 28 U.S.C. § 2241 and requests that the Court vacate the certificate of extraditability and order her release

from custody. As an initial matter, because Tok is not in custody within the District of Massachusetts, this Court is without jurisdiction to consider her habeas petition. Even if the Court were to consider Tok's substantive arguments for relief, they fail because Türkiye has satisfied the requirements of the Treaty.

## BACKGROUND

### I.    Legal Background

"In the United States, the procedures for extradition are governed by statute." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997). These statutes, 18 U.S.C. §§ 3181 *et seq.*, establish "a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State." *Id.* (footnote omitted). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Id.*

Under 18 U.S.C. § 3184, the judicial officer serving as the extradition court—here, the Magistrate Judge—"upon complaint, issues an arrest warrant for an individual sought for extradition" and then conducts a hearing to determine if "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." Specifically, the extradition court determines whether (1) it is authorized to conduct the extradition, (2) it has jurisdiction over the fugitive, (3) the applicable treaty is in full force and effect, (4) the treaty covers the offenses for which extradition is sought, and (5) there is probable cause to believe the fugitive committed the alleged offenses. *See* 18 U.S.C. § 3184; *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984). If the Court finds that the requirements for certification are satisfied, it shall provide the

certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it shall order the fugitive detained to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *see also Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828-29 (11th Cir. 1993). The Secretary will then decide whether to surrender the fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct its foreign affairs.").

A fugitive cannot directly appeal a certification order, but may seek limited review by filing a petition for writ of habeas corpus. *See, e.g.*, *Kin-Hong*, 110 F.3d at 107-108 & n.3; *Koskotas v. Roche*, 931 F.2d 169, 171 (1st Cir. 1991).

## II.    Factual Background[1]

According to Turkish authorities, on the night of March 1, 2024, T.C. was driving Tok's Porsche with three passengers, one in the front, A.K., and two in the back, A.A. and B.A. Ex. C at 5-6, 25, 27, 29, 37-38. T.C.'s friend, D.O.O., was driving another vehicle, also with passengers, directly behind T.C.'s vehicle. *Id.* According to statements provided by T.C.'s friends to Turkish authorities, around 11:20 p.m., T.C. suddenly began driving his vehicle faster after they passed a speed bump in the road. *Id.* at 5, 25, 27, 29, 38. T.C.'s vehicle approached a curve in the road, and according to T.C.'s friends, T.C. was driving too fast through the bend. *Id.* At the same time, there were five individuals with all-terrain vehicles ("ATVs") stopped on the right side of the road just past the bend, trying to fix one of the ATVs that had broken down. *Id.* at 5-6, 25, 27-30, 38. In an attempt to avoid hitting the people on the side of the road, T.C. suddenly turned the steering wheel

---

[1] The facts in this section are taken from Türkiye's Request for the Extradition of Eylem Tok ("Extradition Request"), a redacted copy of which is attached hereto as Exhibits A through D. Unredacted copies of these exhibits will be filed under seal.

to the left, but the sudden turn caused the car to skid and crash into them. *Id.* at 38; *see also id.* at 5-6, 25, 27-30. T.C.'s car ended up in a water channel on the opposite side of the road. *Id.* at 5-6, 25, 27-30, 38-39. One of the individuals died from the impact with T.C.'s car; all of the others were injured. *Id.* at 5-6; Ex. D at 16.

According to witnesses, T.C. and his friends had been driving around for some time before the crash, including a stop at a liquor store to purchase cigarettes. Ex. C at 24-25, 27, 29, 37-38. None of the passengers in T.C.'s or D.O.O.'s vehicles reported to authorities that T.C. had been intoxicated, although T.C. fled the scene before any tests could be performed. *Id.* at 6-8, 17, 38; *see also id.* at 13, 25-26, 40. There also did not appear to be any indication that T.C.'s vehicle had malfunctioned. *See generally* Ex. C. T.C. and his friends did not have driver's licenses. *Id.* at 25.

Immediately after the crash, T.C. called his personal driver and Tok. *Id.* at 13, 17. One of Tok's employees told authorities that she and Tok then drove to the scene and took T.C. and two of his friends, D.O.O. and A.K., home. *Id.* at 17; *see also id.* at 25-26, 28, 30, 38. In doing so, Tok allegedly prevented police from observing or recording T.C.'s behavior and demeanor at the scene of the crash and from testing him for alcohol or drug usage. Ex. D at 17-18, 21. Police were also unable to interview D.O.O. and A.K. immediately after the crash. *Id.* at 21; *see also* Ex. C at 25-26, 28, 30, 38.

Additionally, one of the victims had handed his phone to Z.H.D., who had been in D.O.O.'s car at the time of the crash, and asked him to use the flashlight feature to examine the victim's head wound. Ex. C at 7, 28. Afterwards, Z.H.D. inadvertently put the victim's phone in his own pocket, and then left the scene in D.O.O.'s car. *Id.* When he realized he still had the victim's phone, Z.H.D. attempted to give it to K.A. who was heading back toward the scene of the crash. *Id.* at 7, 26, 28, 30. Instead, K.A. left the phone at the residential complex where he and others had gathered,

where it was recovered by security guards. *Id.* While D.O.O. was telling the security guards about

the accident, Tok allegedly pushed D.O.O. into a car and took the phone from the security guards,

saying that she knew the owner and would give it to him. *Id.* at 7, 26, 28, 36; *see also id.* at 32.

Meanwhile, D.O.O.'s mother had given her name and phone number to the security guards, to

which she stated Tok reacted by questioning why she gave out her information and saying, "I wish

you hadn't." *Id.* at 7, 32, 34. The security guards reported that they had otherwise intended to

provide the phone to police. *Id.* at 35.

Thereafter, Tok had her employee bring T.C. to her residence while she and T.C.'s driver

drove back to the scene of the crash. *Id.* at 13, 17. However, Tok and the driver turned around and

returned to her residence as soon as they saw a police presence. *Id.* The driver later found the

victim's phone in his car, under the seat where Tok had been sitting. *Id.* at 14. The driver reported

finding the phone to Tok's ex-husband's brother—who consulted Tok's ex-husband's attorney,

who in turn instructed the driver to provide the phone to the police, which he did. *Id.* at 7, 14.

Tok's employee told authorities that she then took Tok and T.C. to the airport. *Id.* at 17-

18; *see also id.* at 7, 14, 22. Surveillance footage from Tok's residential complex and the airport

corroborate the employee's account. *Id.* at 7, 44. According to surveillance footage at the airport,

Tok and T.C. arrived at the Egyptair ticket sales office around 2:35 a.m. on March 2, 2024, only

three hours after the crash. *Id.* at 8, 42. Tok purchased one-way tickets to Cairo, Egypt, for herself

and T.C. in cash. *Id.* at 8, 41. Tok and T.C. traveled to Cairo and continued on to the United States,

landing in New York later that day. *Id.* at 8.

## III.    Procedural Background

On March 6, 2024, Turkish authorities issued an arrest warrant for Tok for the offense of

Protecting an Offender. Ex. C at 53. This document, titled "Arrest Warrant," was issued by the

Istanbul 7th Criminal Judgeship of Peace. *Id.* It identifies the suspect as Tok and lists the "Imputed Offence" as Protecting an Offender in violation of Article 283/I of the Turkish Criminal Code. *Id.* In the decision accompanying the arrest warrant, the judge found "the existence of concrete facts indicating the existence of strong suspicion pointing to commission of an offence, the suspect committed the offence imputed on her and there has been a reason for detention." *Id.* at 51. The judge further found, "by taking into consideration the amount of sanctions foreseen . . . for the offence imputed on the suspect, the upper limit of the penalty and the existence of concrete evidence containing strong suspicion in the file pointing to commission of the offence by the suspect, it has been decided as follows to issue an arrest warrant for the suspect to detain her . . . ." *Id.* On March 13, 2024, Turkish authorities issued a second arrest warrant for Tok for the offense of Destroying, Concealing or Altering Evidence. *Id.* at 56. This document, again titled "Arrest Warrant," was also issued by the Istanbul 7th Criminal Judgeship of Peace. *Id.* It identifies the suspect as Tok and lists the "Imputed Offence" as Destroying, Concealing or Altering Evidence of an Offence in violation of Article 281/1 of the Turkish Criminal Code. *Id.*

On April 3, 2024, Türkiye transmitted its Extradition Request. Ex. A at 4. After vetting by attorneys at the Departments of State and Justice, the Southern District of Florida swore out a complaint for the extradition of Tok on the charge of Protecting an Offender, and a magistrate judge in that district issued a warrant for Tok's arrest. Exs. E & F. Tok was arrested in Boston on June 14, 2024.

Thereafter, Türkiye supplemented its extradition request on June 25, 2024. Ex. D. Attorneys at the Departments of State and Justice further vetted this supplement, and an amended complaint for the extradition of Tok on the charges of Protecting an Offender and Destroying,

Concealing or Altering evidence was sworn out on July 1, 2024. Ex. G.[2]

In October 2024, the Magistrate Judge held an extradition hearing under 18 U.S.C. § 3184. After holding that hearing and considering the parties' extensive briefing, the Magistrate Judge held that he would certify Tok's extradition to the Secretary of State under 18 U.S.C. § 3184. Ex. H at 2, 49-50. Among other things, the Magistrate Judge found that (1) he had authority to conduct the extradition proceeding, (2) the court had jurisdiction over Tok because she was arrested in Massachusetts, (3) the Treaty was in full force and effect, (4) the charges of Protecting an Offender, in violation of Article 283 of the Turkish Criminal Code, and Destroying, Concealing or Altering Evidence, in violation of Article 281 of the Turkish Criminal Code, were covered by the Treaty, and (5) there was probable cause that Tok committed these offenses. In reaching these conclusions, the Magistrate Judge rejected Tok's arguments that neither offense was punishable by more than one year in prison and that dual criminality did not exist. *Id.* at 18-23, 25-31. The Magistrate Judge also rejected Tok's contention that she has not been charged with an offense under the Treaty, and instead found, consistent with case law considering similarly worded treaties, that the Treaty does not require that Tok be formally charged with an offense and that the record "establishes unambiguously that Turkish officials view Tok as a suspect." *Id.* at 39. The Magistrate Judge issued the corresponding certification order on February 19, 2025. Ex. I.

On March 19, 2025, Tok filed her habeas petition and accompanying memorandum of law seeking to vacate the certificate of extraditability and for her immediate release from custody. Dkts. 1, 3. Tok challenges the Magistrate Judge's findings that she has been charged with an offense within the meaning of the Treaty, that she may be punished by more than one year in prison for the alleged offenses, and that dual criminality exists. Tok also alleges that the arrest warrants

---

[2] Because Tok was already in custody, no new arrest warrant was sought.

do not support extradition and that her arrest and detention violate the Fourth Amendment, Due Process Clause, and 18 U.S.C. § 3184. As explained below, this Court lacks jurisdiction to consider Tok's petition, but in any event, each of her arguments is without merit.

## ARGUMENT

## I.    The Court Lacks Jurisdiction Over Tok's Habeas Petition

A petition under 28 U.S.C. § 2241 may only be brought in the district court with jurisdiction over the inmate's custodian. *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."). The "plain language" of 28 U.S.C. § 2241 "confirms the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement." *Id*. at 443; *see also United States v. Barrett*, 178 F.3d 34, 50 n.10 (1st Cir. 1999). This rule "serves the important purpose of preventing forum shopping by habeas petitioners. Without it, a prisoner could name a high-level supervisory official as respondent and then sue that person wherever he is amenable to long-arm jurisdiction. The result would be rampant forum shopping, district courts with overlapping jurisdiction, and the very inconvenience, expense, and embarrassment Congress sought to avoid when it added the jurisdictional limitation 137 years ago." *Padilla*, 542 U.S. at 447.

Here, because Tok is detained at the Wyatt Detention Facility in Rhode Island, only the Federal District Court for the District of Rhode Island has jurisdiction to provide habeas relief. *See Velasquez v. Garland*, No. 22-cr-11217-RGS, 2022 WL 3229852, at *1 (D. Mass. Aug. 10, 2022) (dismissing § 2241 petition for lack of jurisdiction where defendant was in custody at Wyatt; "Here, Velasquez is not confined within the District of Massachusetts. Rather, he is confined in the District of Rhode Island. Although the criminal proceeding against Velasquez is in the District

of Massachusetts, this Court's habeas jurisdiction does not extend to the district of his pretrial confinement."); *Aguasvivas v. Pompeo*, 405 F. Supp. 3d 347, 352 n.8 (D.R.I. 2019) ("The extradition proceedings were held in the District of Massachusetts, but Mr. Aguasvivas is being held at the Wyatt Detention Facility in Rhode Island. The Government is not contesting that venue is proper in the District of Rhode Island."), *aff'd in part, rev'd in part on unrelated grounds*, 984 F.3d 1047 (1st Cir. 2021). In reaching this conclusion, the *Aguasvivas* court cited *Zhenli Ye Gon v. Holder*, 992 F. Supp. 2d 637, 643 (W.D. Va. 2014), *aff'd sub nom. Zhenli Ye Gon v. Holt*, 774 F.3d 207 (4th Cir. 2014). There, petitioner's extradition proceedings were held in the D.C. District Court, but petitioner was detained at a facility in the Western District of Virginia. *Id.* at 642-43. Petitioner filed habeas petitions in both districts, and, despite that the W.D. Va. District Court had initially transferred the case to the D.C. District Court for the convenience of the parties, the "D.C. District Court held that because [petitioner] was detained in a facility in the Western District of Virginia, a habeas petition could only lie against [his] immediate custodian"—there, the warden of the facility in Virginia—and transferred the case back. *Id.* at 643 (citing *Padilla*, 542 U.S. 426); *see also Zhenli Ye Gon v. Holder*, 825 F. Supp. 2d 278 (D.D.C. 2011) (noting that the court "certainly does not take the step of returning the case lightly," but nevertheless transferring the matter back to W.D. Va. "based solely on the fact that a necessary predicate for transfer is the existence of jurisdiction in the transferee court, and the application of Supreme Court precedent"— referring to *Padilla*—"indicates that there is no concurrent jurisdiction in this case.") (footnote omitted).[3]

    Accordingly, the Court lacks jurisdiction to consider Tok's petition under 28 U.S.C.

_____

[3] Given its relevance to the jurisdictional question here, a copy of the D.C. District Court's memorandum and order is attached hereto as Ex. J.

§ 2241. In such circumstances, the Court may dismiss the petition or transfer it to the R.I. District Court pursuant to 28 U.S.C. § 1404(a). *See Teixeira v. United States*, No. 21-cv-11333-FDS, 2023 WL 6881975, at *1 (D. Mass. Oct. 18, 2023) (finding court lacked jurisdiction over § 2241 petition filed by detainee held at Wyatt and transferring action to D.R.I.); *Velasquez*, 2022 WL 3229852, at *1 (dismissing § 2241 petition of detainee held at Wyatt for lack of jurisdiction, but refusing to transfer matter to D.R.I. because doing so was not in the interest of justice); *McMann v. United States*, No. 12-cv-11952-PBS, 2013 WL 1327229, at *1 (D. Mass. Mar. 26, 2013) (dismissing § 2241 petition filed by detainee held at Wyatt with pending criminal matter in D. Mass. for lack of jurisdiction, among other reasons).

While the absence of jurisdiction should end this matter, either by dismissal or transfer to the R.I. District Court, the government nevertheless responds to Tok's substantive arguments to avoid delay if the Court orders a transfer of this matter to the R.I. District Court.

## II.    Each of Tok's Bases for Relief Are Without Merit

In the extradition context, habeas corpus review is available "only to inquire [1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty and [3], by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (emphasis added); *see also Kin-Hong*, 110 F.3d at 110. This review is "not meant to be 'a means for rehearing what the magistrate already decided.'" *Koskotas*, 931 F.2d at 171 (quoting *In re Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir. 1989) (quoting *Fernandez*, 268 U.S. at 312)); *see also Kin-Hong*, 110 F.3d at 117 (magistrate's findings are entitled to a "fairly deferential review") (citations omitted).

Where, as here, the Court must interpret the requirements of the Treaty, the first step is to

begin with its text. *Medellin v. Texas*, 552 U.S. 491, 506-07 (2008) (citing *Air France v. Saks*, 470 U.S. 392, 396-97 (1985)). Unlike criminal statutes, extradition treaties are to be construed liberally in order to effectuate their purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."); *In re Extradition of Nezirovic*, No. 12-mc-00039, 2013 WL 5202420, at *5 (W.D. Va. Sept. 16, 2013) ("Treaties are construed liberally to favor the obligation to surrender fugitives.") (citation omitted). Further, deference is owed to the treaty partners on the meaning of the terms in a treaty. *See, e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) (giving deference to the interpretation of a treaty provision as set forth in diplomatic notes exchanged between the responsible agencies of the United States and Yugoslavia); *Arias Leiva v. Warden*, 928 F.3d 1281 (11th Cir. 2019) (finding that the U.S.-Colombia extradition treaty was in full force and effect because, *inter alia*, both the United States and Colombia understand it to be in effect); *see also BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) (courts must "give 'the specific words of [a] treaty a meaning consistent with the shared expectations of the contracting parties.'") (quoting *Air France*, 470 U.S. at 399). Even where a treaty's text is ambiguous, if it "reasonably accommodates" the government's construction, the court "defers to that construction whether or not it is a construction we would adopt de novo." *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) (citing *Kin-Hong*, 110 F.3d at 110).

## A.    The Treaty Does Not Require Formal Charges

Nothing in the Treaty requires Türkiye to issue a formal charge, such as an indictment or criminal complaint, before Tok can be extradited. Article 1 of the Treaty provides for the extradition of persons "who are being prosecuted for or have been charged with an offense, or convicted of an offense, or are sought by the other Party for the enforcement of a judicially

pronounced penalty for an offense . . . ." Ex. A at 9. There is no reference to formal charges or indictment. If formal charges were required to obtain extradition in a pre-conviction case such as this one, there would be no need for Article 1 to expressly cover both individuals "who are being prosecuted" *and* "who have been charged." Indeed, the alternative phrasing of the treaty language signals that the treaty partners intended to allow for extradition of a person who has been "charged" with an offense irrespective of whether the person is being prosecuted for the offense. *See Aguasvivas*, 984 F.3d at 1058 (declining to adopt interpretation that would render treaty language "entirely superfluous").

As the Magistrate Judge found, this interpretation is consistent with the plain meaning of the verb "to charge": "[t]o accuse (a person) of an offense." Charge (vb.), Black's Law Dictionary (12th ed. 2024). The record establishes that Tok is accused of committing the Article 281 and Article 283 offenses. *See, e.g.*, Ex. D at 16, 24-25. In arguing to the contrary, Tok relies on the meaning of the noun "charge," which is a "formal accusation of an offense as a preliminary step to prosecution." Charge (n.), Black's Law Dictionary (12th ed. 2024). But Article 1 does not refer to "a charge," the noun, but rather to persons who "have been charged," the verb—in other words, persons, like Tok, who have been accused of an offense.

The omission of any reference to a charging document in Article 7 of the Treaty, which lists the items that must be included in the extradition request, further confirms this reading. Ex. A at 14-15 (extradition request must contain the warrant for arrest, a statement of the facts, evidence sufficient to justify arrest and committal for trial, evidence sufficient to establish that the person sought is the person named in the warrant, and the text of the laws governing the offense, punishment, and statute of limitations). As the Magistrate Judge found, "the fact that Türkiye and the United States in the Treaty did not require the extradition file to contain any document

regarding a charge in Article 7 reinforces that they did not intend to require the fugitive to be formally charged in Article 1." Ex. H at 34 (citing *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1448, n.3 (9th Cir. 1987)); *see also Manrique v. Kolc*, 65 F.4th 1037, 1043 (9th Cir. 2023) ("our rules of interpretation militate against reading in a requirement of particular formal charges where the treaty makes no such specification").

Every circuit to consider arguably less flexible language in extradition treaties has concluded that formal charges are not required and that extradition for further investigation and prosecution is permissible.

As a matter of first impression, the Seventh Circuit found that similar language in the U.S.-Sweden Extradition Treaty did not require formal charges. *Matter of Assarsson*, 635 F.2d 1237 (7th Cir. 1980), *cert. denied* 451 U.S. 938 (1981). The extradition request in *Assarsson* included an arrest warrant issued by a Swedish court, although no formal charging document had yet been filed. *Id.* at 1239. Like the Treaty here, the treaty in *Assarsson* provided for the extradition of "those persons found in its territory *who have been charged* with or convicted of any of the offenses specified in Article II . . . ." *Id.* (quoting U.S.-Sweden Treaty) (emphasis added). The Seventh Circuit found that the "word 'charge' is thus used in contrast to 'convicted'" and the term "charged" "is used in the generic sense only to indicate 'accused.'" *Id.* The court found that the documents that must accompany the extradition request—including a "'duly certified or authenticated copy of the warrant of arrest or other order of detention'"—did not include a formal charging document. *Id.* at 1243 (quoting U.S.-Sweden Treaty). The absence of a requirement that the requesting party provide a copy of a charging document in the extradition request led the court to conclude that formal charges were not a prerequisite to extradition. *Id.*

In *Emami*, the Ninth Circuit relied on the reasoning of *Assarsson* to hold that an individual

sought for "'detention for investigation'" without formal charges could be extradited under the terms of the U.S.-Germany Extradition Treaty. 834 F.2d at 1446. That treaty provided for the extradition of persons "'*who have been charged with an offense* or are wanted by the other Contracting Party for the enforcement of a judicially pronounced penalty or detention order . . . .'" *Id.* at 1448 (quoting U.S.-Germany Treaty) (emphasis added). Like the treaties here and in *Assarsson*, the U.S.-Germany Treaty required the requesting party to include in the extradition request the arrest warrant but not a formal charging document. *Id.*

The Second Circuit weighed in on this issue in *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009). There, the U.S.-Serbia Extradition Treaty "authorize[d] the extradition of an individual *who has been 'charged'* with a crime." *Id.* at 54 (quoting U.S.-Serbia Treaty) (emphasis added). Despite that "Bosnia had failed to charge him formally with an extraditable offense," the Second Circuit agreed that the interpretation of "charged" did not require a formal charging document because "it gives meaning to treaty language stating that an individual must be 'charged' with an offense in order to be extradited, while avoiding unwarranted incursions into the fine details of foreign criminal procedure." *Id.* at 65.[4] Ultimately the Second Circuit held Sacirbey was not extraditable, not because formal charges were lacking, but because the Bosnian court that issued his arrest warrant had been dissolved, and thus Bosnia could not satisfy the requirement of providing a valid arrest warrant with the extradition request. *Id.* at 66-67.

In *Manrique*, the Ninth Circuit went even further and held that the U.S.-Peru Extradition Treaty, which required Peru to submit "a copy of the charging document" with its extradition request, still did not mandate a "formal charge" because the treaty there provided for extradition

---

[4] Similarly, the Ninth Circuit chose not to wade into whether there had been compliance with foreign criminal procedure in *Emami* "both out of respect for German sovereignty and because we recognize the chance of erroneous interpretation." 834 F.2d at 1449.

of persons "'the authorities in the Requesting State *have charged with*, found guilty of, or sentenced for, the commission of an extraditable offense.'" 65 F.4th at 1041-43 (quoting U.S.-Peru Treaty) (emphasis added). Because "the ordinary meaning of the verb 'charge' is to generally accuse someone of a crime," the "charging document" requirement of the U.S.-Peru Treaty, which "specifie[d] no particular document," was satisfied by a document that identified the crimes the fugitive was accused of and summarized the supporting evidence. *Id.*

Although in dicta, the First Circuit commented on this issue in *Aguasvivas*, 984 F.3d at 1060. There, the court stated, "we readily agree with the holdings and the rationale in both *Emami* and *Assarsson*" and "we could rule for the government in this case were the language of this treaty materially similar to the language of those treaties." *Id.* However, the language in the U.S.-Dominican Republic Extradition Treaty at issue in *Aguasvivas* is materially different from the treaties addressed in *Assarsson* and *Emami* and the U.S.-Türkiye Treaty. The U.S.-Dominican Republic Treaty required, in addition to an arrest warrant, "'a copy of the document setting forth *the charges* against the person sought.'" *Id.* at 1055 (quoting U.S.-Dominican Republic Treaty) (emphasis added). In considering whether an arrest warrant could do double duty, the First Circuit held that such a reading "would render superfluous a relatively bespoke requirement" of a separate document setting forth the charges—a requirement not present in the U.S.-Türkiye Treaty.

The Fourth Circuit's decision in *Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023), does not change the analysis. There, the U.S.-Lithuania Extradition Treaty specifically required "'a copy of the charging document.'" *Id.* at 363 (quoting U.S.-Lithuania Treaty). In the face of this explicit requirement, the Fourth Circuit found that the treaty "requires a discrete document that initiates criminal charges." *Id.* at 363. In contrast, there is no such provision in the U.S.-Türkiye Treaty. Tok attempts to downplay this distinction, Dkt. 3 at 9, by claiming the Fourth Circuit was analyzing

15

the meaning of the verb "to charge" rather than the requirement of Article 8 § 3(b) of the U.S.-Lithuania Treaty that the extradition request include "a copy of the charging document," which the court referred to as "the charging document mandate." *Vitkus*, 79 F.4th at 355. But this claim ignores the plain holding of *Vitkus*:

> To summarize, the charging document mandate spelled out in Article 8 § 3(b) of the Treaty requires the production of a discrete charging document—that is, the instrument (comparable to an indictment, information, or complaint) that has initiated criminal charges against Vitkus. And, in these circumstances, the Notification of Suspicion and Suspect Decisions have not initiated criminal charges against Vitkus. As a result, those documents are not "*the* charging document" required by Article 8 § 3(b).

*Id.* at 367 (emphasis in original). In other words, the focus of the *Vitkus* court was not on whether Article 1 of the U.S.-Lithuania Treaty, which provided for extradition of "persons whom the authorities in the Requesting State have charged with . . . an extraditable offense," but whether the "Notification of Suspicion and Suspect Decision" satisfied the requirement of Article 8 § 3(b) that the extradition request include "a copy of the charging document." *Id.*

Tok attempts to further distinguish this line of cases by suggesting that they are dicta and limited to whether the petitioner could obtain habeas review of the question whether they were "charged" under the applicable treaty. But again, she misstates the holdings of these cases. For example, in *Assarsson*, the Seventh Circuit held that "[t]he existence of formal charges can be reviewable, then, only if the treaty itself conditions extradition for the offenses listed in Article II on the existence of formal charges," and went on to hold that the U.S.-Sweden Treaty, with language similar to the Treaty here, "does not so condition extradition." 635 F.2d at 1241. Likewise, in *Emami*, the Ninth Circuit held that "[w]hether a treaty conditions extradition upon the filing of formal charges is a question cognizable on appeal from the denial of a petition for habeas corpus." 834 F.2d at 1448. That is the same question Tok raises here, and based on a plain reading of the Treaty and the case law described above, there can be no doubt that Treaty does *not*

16

condition extradition on the existence of formal charges.

Tok next argues, Dkt. 3 at 10, that the Court must find she is "wanted for prosecution." As the Magistrate Judge found, Türkiye has unequivocally stated its intent to prosecute Tok. Ex. H at 39; *see also* Ex. D at 16 ("Eylem Tok committed the offences of Destroying, Concealing or Altering Evidence and Protecting the Offender, regulated in the Articles 281 and 283 of Turkish Penal Code respectively."); *id.* at 24 ("There is no legal situation, preventing the filing of a public lawsuit and conducting trial against Eylem Tok."); *id.* ("the defendant must be tried"); *id.* at 25 (discussing "carry[ing] out investigation *and prosecution* about [Tok] due to both offences" of Protecting an Offender and Destroying, Concealing or Altering Evidence) (emphasis added). For this same reason, Tok's argument that Türkiye should have used the provisions of the Treaty governing requests for mutual assistance, Dkt. 3 at 10-14, is misplaced and relies on a fundamental misunderstanding of Türkiye's extradition request. Türkiye is not seeking Tok's extradition solely to take her testimony; it is seeking to prosecute her for the Articles 281 and 283 offenses. The Turkish prosecutor should not be penalized for wanting to gather all the relevant evidence—including Tok's statement—before instituting formal charges.[5] Likewise, Tok should not be rewarded for fleeing and thus preventing the prosecutor from obtaining this evidence.

## B.    The Arrest Warrants Meet the Requirements for Extradition under the Treaty

Article 7 of the Treaty requires the extradition request include "[a] warrant of arrest issued by a judge or other competent judicial officer." Ex. A at 14. The Treaty does not identify any other qualification for the arrest warrant. Both of the arrest warrants here were issued by the Istanbul 7th Criminal Judgeship of Peace. Ex. C at 53, 56. Both identify the suspect, Tok, and the respective

---

[5] Indeed, as demonstrated by the holdings of the cases cited above, it is not uncommon for foreign countries to bring formal charges only after the fugitive returns to that country.

offense charged. *Id.* Nothing more is required, particularly where, as here the Treaty is "to be construed liberally in favor of enforcement because they are 'in the interest of justice and friendly international relations.'" *Kin-Hong*, 110 F.3d at 110 (quoting *Factor*, 290 U.S. at 293).

Moreover, it is not the Court's role to second-guess Türkiye's determination of what constitutes a valid arrest warrant. *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (refusing to "second-guess" Bosnian government's determination of what constitutes an arrest warrant); *see also Noeller v. Wojdylo*, 922 F.3d 797, 805 (7th Cir. 2019) ("Extradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law,' and American extradition courts therefore have consistently cautioned against doing so . . . ."); *see also Nezirovic*, 2013 WL 5202420, at *15 ("It would be a grave insult for this court to presume to tell the Government of Bosnia and Herzegovina what is or is not legitimate under Bosnian law."). Deference to Türkiye's interpretation of its own laws is also consistent with the principle of international comity and "respect for the sovereignty of other nations," *Assarsson*, 635 F. 2d at 1244, and avoids the risk that a U.S. court might erroneously interpret the law of a foreign country. *Id.* ("The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters."). Indeed, even the court in *Sacirbey*, on which Tok relies, Dkt. 3 at 14-15, did not rule that the arrest warrant there was invalid because of an issue with the form or content of the warrant, but rather because the court that issued it had been dissolved and thus, could not enforce the warrant, making it invalid. 589 F.3d at 67. Further, that Türkiye has previously sought the extradition of individuals who have either already been indicted or convicted, *see* Dkt. 3 at 16-17, as permitted by the Treaty, does not undermine the fact that the arrest warrants here satisfy the

requirements of the Treaty.[6]

### C.    Tok Is Punishable by More Than a Year in Prison

Tok claims her potential punishment on the Article 281 offense would not exceed one year in prison because her son's driver turned the cellphone in question into the police. Dkt. 3 at 21-22. Notably, Tok did not direct the driver to turn in the phone, but rather her ex-husband's attorney instructed him to do so. Ex. C at 7, 14. As the Magistrate found, whether the driver acted as Tok's agent under these circumstances is a question for trial. Ex. H at 21-22 (citing, *inter alia*, *Matter of Extradition of Acevedo*, No. 16-cv-01766-R (KS), 2017 WL 3491749, at *11 (C.D. Cal. Aug. 11, 2017) (given "two clearly disputed versions of facts," court "cannot determine the credibility of the evidence offered by Acevedo against the evidence offered by the Mexican government," which "is a matter for trial in Mexico") and *Freedman v. United States*, 437 F. Supp. 1252, 1266 (N.D. Ga. 1977) (stating, in habeas petition challenging extradition, "presentation of witnesses who testify as to an opposite version of facts will not" eliminate probable cause, and "resolution of such conflicts . . . must await a trial on the merits")); *see also* Ex. D at 20 ("The difference between being in possession of TOK and being in possession of one of her subordinates *will only emerge as a result of the trial.*") (emphasis added).[7]

Tok's argument that any sentence would be reduced by four-fifths because her son's driver turned in the cellphone also ignores Tok's other actions underlying the Article 281 charge: her

---

[6] Tok also fails to provide any reason why she could not raise her legal challenges to the validity of the arrest warrants during criminal proceedings in Türkiye upon her extradition.

[7] Tok's claim that T.C.'s driver acted as her agent in turning in the phone to police is also an affirmative defense raised in effort to negate her liability, which falls outside the scope of an extradition court's review and is an issue reserved for the Turkish courts. *See*, *e.g.*, *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *27 (S.D. Fla. Aug. 31, 2017) (collecting cases).

removal of T.C. and two of his friends from the scene of the crash, which prevented police from observing and questioning them immediately after the incident and from testing T.C. for alcohol and drug use. Ex. D at 17, 21. Tok does not suggest that this conduct would receive a lesser sentence; rather, it is subject to the maximum five years in prison.

Because Tok is subject to more than a year in prison (and thus extraditable) for the Article 281 offense, Article 2(4) of the Treaty permits her extradition on the Article 283 offense regardless of the penalty for that offense. Article 2(4) of the Treaty provides, "When a request for extradition comprises several separate offenses and extradition has been granted for one of the extraditable offenses, it shall also be granted for other extraditable offenses which could not otherwise fulfill the requirements of paragraphs (1) and (2) above as related to the deprivation of liberty to be served . . . ." Ex. A at 11. In other words, the Court may certify extradition for an offense that does not carry a penalty that deprives the person of liberty for a period exceeding one year, so long as the Court also certifies extradition on a separate offense that does carry such a penalty—here, the Article 281 offense. Moreover, on its face, the Article 283 offense carries a maximum penalty of five years' imprisonment. Ex. D at 22. While Tok has argued that, as T.C.'s mother, she cannot be imprisoned for any period for an Article 283 offense, Dkt. 3 at 20, Türkiye has explained that "The decision of not to impose a penalty, which is regulated in the law as a consequence of personal exemption from punishment, is not considered as an obstacle to investigation and prosecution and is not regulated as a decision of 'acquittal' by the court." Ex. D at 24. Rather, "Eylem Tok's status as a mother must be established and certified before the court," *id.* at 22, and to the extent proof of that fact may alter the penalty, "[o]nly the court can make such a decision as a result of the trial." *Id.* at 23. Again, Türkiye's interpretation of its own laws and procedures is entitled to deference. *Assarsson*, 635 F. 2d at 1244; *Emami*, 834 F.2d at 1449. Likewise, longstanding case law confirms that an affirmative defense such as this one fall outside the scope of an extradition court's review. *See*,

*e.g.*, *Martinelli Berrocal*, 2017 WL 3776953, at *27 (collecting cases).

### D. Dual Criminality Exists Here

Articles 1 and 2 of the Treaty provide for the extradition of fugitives who have been charged with (1) "Offenses, regardless of whether listed in the Appendix to this Treaty or not, which are punishable under both the federal laws of the United States and the laws of Turkey by deprivation of liberty at least for a period exceeding one year or by a more severe penalty"; or (2) "Offenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty." In determining whether an offense is punishable under the laws of both countries, extradition courts properly look to the underlying acts to determine whether, if they had been committed in the United States, they would violate United States federal law, the law of the state in which the hearing is held, or the law of the preponderance of the states. *See Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981); *Manzi*, 888 F.2d at 207. Because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902); *see also Factor*, 290 U.S. at 303, a court should "approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("The point of an extradition treaty after all is to facilitate extradition . . . ."), *cert. denied*, 137 S. Ct. 243 (2016).

The Turkish offenses need not be identical to ours. Indeed, the Supreme Court has held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. *Collins*, 259 U.S. at 312; *see United States v. Riviere*, 924 F.2d 1289, 1302 (3d Cir. 1991) ("[T]he rule of double

criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours."); *see also* Ex. A at 10 (Treaty, Article 2(1)(b)). As the First Circuit has explained, "[t]he purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries." *Kin-Hong*, 110 F.3d at 114 (citing *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995)).

In her habeas petition, Tok does not challenge the Magistrate Judge's finding that dual criminality exists for the Article 283 offense, but argues that her conduct does not fall within either Article 281 or the corresponding United States law. She is wrong on both counts.

Article 281 penalizes "[a]ny person who destroys, erases, alters, conceals, or damages evidence of an offence in order to prevent the emergence of the truth." Ex. C at 3. Türkiye alleges that Tok concealed the cellphone from police by taking it from the security guards (who were otherwise planning to turn the phone into police) by lying to them about knowing the owner. When the security guards asked for the phone back, Tok refused.[8] Likewise, Tok concealed evidence of who was driving the car and whether he was intoxicated by removing T.C. and two of his friends from the scene of the crash before they could be interviewed (and the driver immediately identified) and before T.C.'s intoxication level could be tested. *E.g.*, Ex. D at 17-18.[9]

Contrary to Tok's contention, Dkt. 3 at 24, her conduct falls within item #19 of the Appendix, which lists "Unlawful obstruction of judicial proceedings or proceedings before government bodies or interference with an investigation of a violation of a criminal statute, by

---

[8] Tok's argument that she could not conceal something that was not yet in her possession at the time of her contact with the security guards, Dkt. 3 at 24, appears to misconstrue the basis for the offense. She is not alleged to have concealed the phone from the guards, but from the police.

[9] Having found dual criminality based on Tok's taking of the cellphone, the Magistrate Judge did not address this additional factual basis for the Article 281 offense. Ex. H at 40-41, n.34.

influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator" as an extraditable offense. By concealing the cellphone and witnesses, Tok interfered with an investigation by impeding witnesses and duly authorized criminal investigators.

As the Magistrate Judge found, Tok's conduct also violates 18 U.S.C. § 1512(b)(3). Ex. H at 28-30. That statute prohibits "knowingly . . . engag[ing] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense." Section 1512(b)(3) was designed to "facilitate federal law enforcement's ability to gather information about possible federal crimes—including federal crimes that are not yet under investigation at the time of the offense." *United States v. Bailey*, 405 F.3d 102, 108 (1st Cir. 2005); *accord United States v. Guadalupe*, 402 F.3d 409, 411 (3d Cir.2005). Again, Tok's actions in misleading the security guards so that they would give her the phone and not turn it over to the police frustrated the ability of investigators to gather information about the accident, including potential photos or video of the crash on the cellphone, as well as GPS location and acceleration data maintained on the phone, which could show where the victim was located at the time of impact and the speed at which the victim was thrown.[10]

Having found that dual criminality exists between Article 281 and 18 U.S.C. § 1512(b)(3), the Magistrate Judge did not need to go further.[11] Nevertheless, Tok could also be charged under

---

[10] Tok's reliance on *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991), and *United States v. King*, 762 F.2d 232, 237 (2d Cir. 1985), Dkt. 3 at 25, is misplaced. Both decisions rested on the absence of any attempt to mislead, not whether 18 U.S.C. § 1512(b)(3) is limited to witness testimony.

[11] "While it is true that, as a general matter, federal courts of appeals do not rule on issues not decided in the district court, we do have discretion to address issues not reached by the district

18 U.S.C. § 1512(c)(2) in connection with her removal of T.C. and his friends from the crash scene. That statute criminalizes "impairing the availability of other things used in an official proceeding . . . such as witness testimony." *Fischer v. United States*, 144 S. Ct. 2176, 2186 (2024). In removing T.C. and two of his friends from the crash scene, Tok prevented investigators from observing their behavior, taking witness statements, and testing T.C. for alcohol or drug consumption, impairing the availability of this evidence in the investigation.

Because the Article 281 offense falls within the Appendix to the Treaty, the Magistrate Judge could also have considered potential state law charges—here, M.G.L. c. 268, §§ 13B and 13E. Section 13B criminalizes those who:

> willfully, either directly or indirectly . . . mislead . . . another person who is a: (A) witness or potential witness; (B) person who is or was aware of information, records, documents or objects that relate to a violation of a criminal law . . . ; (C) . . . police officer, . . . [or] investigator . . ., with the intent or with reckless disregard for the fact that it may . . . impede, obstruct, delay, prevent or otherwise interfere with: a criminal investigation at any stage, a grand jury proceeding, . . . or other criminal proceeding of any type.

The Supreme Judicial Court has held that conduct is "misleading" if "it reasonably could lead investigators to pursue a course of investigation materially different from the course they otherwise would have pursued." *Commonwealth v. Paquette*, 475 Mass. 793, 801 (2016). In removing T.C., D.O.O., and A.K. from the crash site before they could be interviewed (and the driver immediately identified) and before T.C.'s intoxication level could be tested, Tok lead investigators away from pursuing enhanced charges against T.C. for driving under the influence and from seeking an earlier

---

court when the question is essentially legal and the record is complete." *Kin-Hong*, 110 F.3d at 116 (internal citations omitted) (opting to consider issue not reached by district court where "[w]e have before us the parties' memoranda on probable cause to the district court and the magistrate judge as well as the completed evidentiary record" because it was in "the interest of conserving judicial resources and mindful of the policy that extradition matters [are] to be handled expeditiously").

arrest warrant (before T.C. could flee the country). *E.g.*, Dkt. 73-4 at 17-18. With respect to lying to the security guards about knowing the owner of the cellphone, Tok changed their course of conduct from turning the phone over to police as they originally intended to relying on Tok to return the phone to the victim. *E.g.*, Dkt. 73-3 at 35.[12]

For taking the victim's phone from the security guards, promising to return it to the victim, and subsequently concealing it under the seat in the driver's car, Tok could also be charged under M.G.L. c. 268 § 13E because she "conceal[ed]" an "object . . . with the intent to impair . . . [its] availability for use in an official proceeding." Tok previously suggested before the Magistrate Judge that T.C.'s driver ensured the phone was made available to police, but the driver discovered the phone only by chance, and only after Tok insisted on keeping the phone after the security guards asked her to return it and after she demonstrated her intent to conceal by telling D.O.O.'s mother that she wished she had not provided her name and contact information to the security guards. *E.g.*, Ex. C at 14, 26, 32, 34, 36.

Tok also contends that she could not have violated Article 281 because the cellphone is not "evidence" under Turkish law. Dkt. 3 at 28-29. As an initial matter, this argument ignores her removal of T.C. and his friends—and associated evidence in the form of their statements and testing T.C. for intoxication—from the crash scene. In any event, the extradition request states that "[Tok] prevented the police or people from finding the cell phone, *which we consider as evidence*, . . . ." Ex. D at 21 (emphasis added). That Türkiye elsewhere indicates the cellphone "might"

---

[12] The holding in *Commonwealth v. Tejeda*, 476 Mass. 817 (2017), on which Tok relied before the Magistrate Judge, does not alter this analysis. There, the SJC found that the destruction of evidence was not a violation of § 13B because the defendant destroyed the evidence in full view of the police and took no steps to mislead them. *Id.* at 820. In contrast, Tok lied to the security guards about knowing the owner of the phone and took T.C. and his friends from the scene *without* police knowledge.

contain additional evidence such as photos or videos—for example, when describing what *Tok* thought when she took the phone—does not undercut the statement that Türkiye considers the phone itself to be evidence. *See, e.g.*, Ex. D at 21 ("It was proven with witness statements that Eylem Tok took possession of the cell phone belonging to the victim [I.G.], with the belief that it might contain evidence of the accident and with the intention of concealing the evidence."). Unable to make her argument based on the four corners of the extradition request, Tok relies on an affidavit from a Turkish lawyer purporting to interpret Turkish law. Dkt. 3 at 28-29. But the Magistrate Judge correctly determined that this material—directly contradicting Türkiye's statements in the extradition request that the cellphone is evidence—should not be considered. Ex. H at 24-25. The Magistrate Judge's determination is particularly entitled to deference given the abundance of case law holding that a fugitive may not introduce evidence that contradicts the evidence the government submits on behalf of the requesting country, but may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 457-58 (1913); *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) ("Courts have traditionally distinguished between inadmissible 'contradictory evidence,' which merely conflicts with the government's evidence, and admissible 'explanatory evidence,' which entirely eliminates probable cause.").[13] Indeed, "extradition proceedings are not to be converted into a dress rehearsal trial." *Koskotas*, 931 F.2d

---

[13] *See also Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962) ("The accused is not entitled to introduce evidence which merely goes to his defense but may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal."); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir.), *cert. denied*, 439 U.S. 932 (1978) (("[T]he extraditing court properly may exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity . . . . Because of the limited function of an extradition proceeding and the limited participation permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case.").

at 175 (internal quotation marks and citations omitted). Tok's argument that the cellphone is not evidence is best left for a trial on the merits in Türkiye. *Acevedo*, 2017 WL 3491749, at *11; *Freedman*, 437 F. Supp. at 1266. Moreover, it would be inappropriate for the Court to attempt to interpret foreign law. *E.g.*, *Basic*, 819 F.3d at 901; *Noeller*, 922 F.3d at 805.

### E.    Tok's Fourth Amendment and Due Process Rights Have Not Been Violated

Tok claims that, because Türkiye's initial extradition request omitted paragraph 3 of Article 283, her arrest for that offense and continued detention violate her rights under the Fourth Amendment and Due Process Clause of the U.S. Constitution. The Fourth Amendment provides, in relevant part, that "no warrants shall issue, but upon probable cause, supported by oath or affirmation." Here, Tok's arrest warrant was based on a complaint for extradition under 18 U.S.C. § 3184. Exs. E & F. Among other things, the complaint relayed that the Treaty was in full force and effect, stated that Türkiye sought Tok's extradition for the Article 283 offense, and summarized the facts underlying that offense. *Id.* It also attached Türkiye's full extradition request, with the prosecutor's summary and witness statements, as an exhibit. *Id.* ¶ 8. In short, there was sufficient probable cause for the issuance of the warrant.[14]

Tok's reliance on *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997), does not change the analysis. First, as Tok notes, the Ninth Circuit withdrew its opinion in *Parretti* based on the fugitive disentitlement doctrine, and thus is not good law. *Parretti v. United States*, 143 F.3d 508 (9th Cir. 1998). But even if the Court were to consider the withdrawn opinion, it is inapposite. *Parretti* concerned a provisional arrest request—that is, before an extradition request was submitted—where the arrest warrant was based solely on the existence of a foreign arrest warrant,

---

[14] This is confirmed by the Magistrate Judge's certification order, which found probable cause that Tok had committed the alleged offenses.

without any of the reports, witness statements, or other evidence of the type relied upon here.

Additionally, any error in Türkiye's omission of paragraph 3 of Article 283 from its initial extradition request was cured by Türkiye's inclusion of the missing paragraph in its supplement, Ex. D, and the issuance of an amended complaint against Tok for extradition on both the Article 281 and Article 283 offenses. Ex. G. As discussed above, Tok is extraditable on both offenses.[15] Further, Tok acknowledges that "[n]othing precludes a requesting party from submitting serial extradition requests regarding the same allegations, because the principle of double jeopardy does not apply to successive extradition proceedings. Dkt. 3 at 19 (citing *Collins v. Loisel*, 262 U.S. 426, 429 (1923)). Thus, any error in her initial arrest warrant was harmless. Finally, because there was no error in her arrest, detention, or the Magistrate Judge's finding of extraditability, and she in fact challenged her detention and extraditability before the Magistrate Judge and now in the instant habeas petition, Tok's due process rights have not been violated.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Tok's petition or, in the alternative, transfer it to the U.S. District Court for the District of Rhode Island.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:     */s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant U.S. Attorney

---

[15] Tok's argument rests on her conclusion that she is not punishable by more than a year in prison on the Article 283 offense. As discussed above, *supra* 19-20, Türkiye's view is that "Eylem Tok's status as a mother must be established and certified before the court," Ex. D at 22, and to the extent proof of that fact may alter the penalty, "[o]nly the court can make such a decision as a result of the trial." *Id.* at 23. Türkiye's interpretation of its own laws is entitled to deference. *E.g.*, *Assarsson*, 635 F. 2d at 1244; *Emami*, 834 F.2d at 1449.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant U.S. Attorney

Dated: March 31, 2025