UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EYLEM TOK,<br>    Petitioner,<br><br>        v.<br><br>BRIAN A. KYES, UNITED STATES<br>MARSHAL, DISTRICT OF<br>MASSACHUSETTS,<br>    Respondent. | Docket No. 25-cv-10649 |

## EYLEM TOK'S OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS OR TRANSFER AND SUBSTANTIVE RESPONSE TO GOVERNMENT'S OPPOSITION TO HABEAS
### (Leave to File Granted April 14, 2025)

Petitioner Eylem Tok ("Petitioner" or "Ms. Tok") is in the custody of the U.S. Marshal for the District of Massachusetts, and her claims are properly venued in this District. This Court has proper jurisdiction—as jurisdiction is defined in the habeas context—and may reach the merits of Ms. Tok's petition for habeas relief. Ms. Tok's extradition to Türkiye would violate the Constitution and laws and treaties of the United States. *See* 28 U.S.C. § 2241(c)(3). The two allegations for which extradition is sought fail to meet the requirements of the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Türkiye, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (hereinafter, the "Treaty"). The extradition that Türkiye seeks, and the government intends to execute, is therefore unlawful. Basic principles of judicial economy and fairness to litigants weigh in favor of the Court retaining the case; this Court should therefore retain Ms. Tok's case, grant her petition for release, and order an immediate discharge of the conditions imposed on her.

## I.    ARGUMENT

### A.  This Court May, and Should, Keep Ms. Tok's Case

Ms. Tok has been directly remanded to the custody of Respondent, the U.S. Marshal for the District of Massachusetts, who manages the terms and conditions of Ms. Tok's confinement, including decisions and approval about who may visit Ms. Tok and under what conditions.[1] (*E.g.*, D. 16-8 at 51 (ordering Ms. Tok to remain in custody of U.S. Marshal for District of Massachusetts following certification of extradition); D. 1 at 10-13 (describing Ms. Tok's residence and arrest in Massachusetts).)[2] The Supreme Court has set out a "general rule" that habeas cases be filed in the district of confinement—a baseline that contains exceptions. *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004); *id.* at 454 (Kennedy, J., concurring) (summarizing recognized exceptions and proposing additional exception). The habeas forum analysis discussed in *Padilla* is guided by "traditional venue considerations" and "traditional principles of venue" that weigh in favor of this court retaining the case. *Id.* at 451-52 (Kennedy J. concurring), quoting *Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 493, 500 (1973).[3]

"In the context of a habeas petition, the jurisdictional rules are 'not jurisdictional in the sense of a limitation on subject-matter jurisdiction,' but rather akin to 'personal jurisdiction or venue.'" *Ozturk v. Trump*, No. 25-CV-10695-DJC, 2025 WL 1009445, at *10 (D. Mass. Apr. 4,

---

[1] Ms. Tok is housed at the Donald W. Wyatt Detention Facility, whose public website states: "Detainees housed within the facility are in the custody of the United States Marshals Service's various jurisdictions including, but not limited to: Rhode Island, Connecticut, Massachusetts, New Hampshire, Maine, and Vermont." *See* https://www.wyattdetention.com/.

[2] Docket entries in this matter are referred to as "D." throughout this filing. For clarity, Ms. Tok notes that citations to "D." in her petition and memorandum in support of habeas (D. 1 & D. 3) refer to docket entries of the underlying extradition proceeding, *In re Extradition of Eylem Tok*, No. 24-MJ-01365-DLC, Docket No. 156 (D. Mass. Feb. 11, 2025).

[3] *United States v. Barrett*, 178 F.3d 34, 50 n.10 (1st Cir. 1999), cited by the government, predates *Padilla*, and is at any rate not to the contrary. *Barrett* assumes arguendo that the habeas petition before it was properly venued despite evidence that he was confined outside of Massachusetts (where the petition was brought) at the time of filing. *Id.*

2025), quoting *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring).[4] Like Judge Casper's decision in *Ozturk*, other courts have concluded that the rule set out by *Padilla* is one of venue. *See Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 422-23 (S.D.N.Y. 2018) (concluding *Padilla* is a venue rule while noting that Justice Kennedy's *Padilla* concurrence identified *Padilla* as potentially a venue rule); *Aguasvivas v. Pompeo*, 405 F. Supp. 3d 347, 352 n.8 (D.R.I. 2019), *aff'd in part, rev'd in part and remanded*, 984 F.3d 1047 (1st Cir. 2021) ("venue [for habeas petition] is proper in the district of custody") (citing *Zhenli Ye Gon v. Holder*, 992 F. Supp. 2d 637, 643 (W.D. Va. 2014), *aff'd sub nom. Zhenli Ye Gon v. Holt*, 774 F.3d 207 (4th Cir. 2014)). The Supreme Court has recently confirmed this view. *See Trump et al. v. J.G.G. et al.*, 604 U.S. ___, slip op. at 2 (April 7, 2025) (referring to "core habeas petitions" under *Padilla* as a venue question). The habeas statute itself provides for a petition to be brought outside the district where the person is in custody in certain circumstances, indicating that jurisdiction is tied to basic discretionary principles just as judicial economy and "the furtherance of justice." 28 U.S.C. § 2241(d) (habeas petitions from persons convicted in state court may be brought either in Federal district where petitioner is in custody or in Federal district where petitioner was convicted). *See* 28 U.S.C. § 1404(a) (permitting transfer of civil action based on convenience).

Ms. Tok's case is also distinct from most habeas petitions in that the nucleus of operative facts and core legal arguments in her case are closely related to those of another pending habeas

---

[4] There is no question as to personal jurisdiction: the U.S. Marshal for the District of Massachusetts is subject to jurisdiction of this Court. *E.g.*, *Strait v. Laird*, 406 U.S. 341, 346 n.2 (1972) (it is "well-settled" that presence, including through chain of command or contacts in state, "suffices for personal jurisdiction"). The government's reference to inappropriate use of long-arm jurisdiction is inapplicable: Ms. Tok has named only the Marshal to whose custody she was directly remanded by the Magistrate Judge's order as respondent. (*See* D. 16 at 8; D. 16-8 at 51.)

petition in this District, namely that of T.C., her minor U.S. citizen son.[5] T.C.'s matter has been before this Court since September 2024.[6] At least one court has applied the principles of pendent venue to habeas petitions, noting that it considered "factors such as judicial economy, convenience to the parties and the court system, avoidance of piecemeal litigation and fairness to litigants" in deciding to keep the habeas petition where the petitioner was detained out-of-state. *Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 422-23 (S.D.N.Y. 2018). The requests for T.C. and Tok's extradition arise from the same complex facts. Both require analysis of the same threshold legal issue concerning the Treaty, namely the meaning of the word "charged" therein, where neither Ms. Tok nor T.C. has been indicted or formally charged in Türkiye. This is a narrow and complex legal matter that requires close analysis of a Treaty provision that has not previously been analyzed by Federal courts; to position Ms. Tok and her son such that one could be extradited and the other released if two different District Courts were to nearly-simultaneously come to different interpretations of the same Treaty provision would both be fundamentally unfair to them and create confusion and/or forum shopping in later extradition cases related to the Treaty. Judicial economy, convenience, the avoidance of piecemeal litigation of a broadly applicable treaty, and fairness to litigants regarding the meaning of the Treaty all weigh in favor of the Court retaining Ms. Tok's case, which it may properly do so given that the question underlying *Padilla* is, in essence, one of venue. *See* 28 U.S.C. § 1391(b) (providing for venue in district where defendant resides). *See Krick v. Raytheon Co.*, 695 F. Supp. 3d 202, 211 (D. Mass. 2023), citing *Omran v. United States*, No. 1:14-CV-13881, 2016 WL 4158556, at *7 (D. Mass. June 22, 2016) ("federal courts may exercise their discretion to hear claims as to which venue is

---

[5] *See T.C. v. Kyes*, Case No. 24-cv-12458-ADB (D. Mass).

[6] T.C.'s amended habeas petition was filed on February 25, 2025, several weeks before Ms. Tok's petition.

lacking if those claims arise out of a common nucleus of operative facts as the claims that are appropriately venued *and* the interests of judicial economy are furthered by hearing the claims together").

The cases the government cites transferring habeas petitions from persons in custody at the Wyatt Detention Facility are neither analogous nor persuasive. None of those cases pertain to transferring the habeas petition of an individual being held for possible extradition. *McMann v. United States* addresses a *Bivens* claim, not a habeas petition, and was dismissed for procedural reasons related to the *Bivens* action. *McMann v. United States*, No. CA 12-11952-PBS, 2013 WL 1327229, at *1 & n.1 (D. Mass. Mar. 26, 2013) (describing *Bivens* direct cause of action and petitioner's failure to state a claim thereunder). The Court in *McMann* simply recites the "traditional rule" from *Padilla* regarding a hypothetical habeas action by Mr. McMann. *Id. See Teixeira v. United States*, No. CV 21-11333-FDS, 2023 WL 6881975, at *1 (D. Mass. Oct. 18, 2023) (transferring "likely moot" petition regarding "conditions and location of his custody" with single citation to *Padilla*); *Velasquez v. Garland*, No. CV 22-11217-RGS, 2022 WL 3229852, at *1 (D. Mass. Aug. 10, 2022) (dismissing habeas petition where other remedies available to pretrial detainee and noting habeas "should not be granted in advance of trial"). The Rhode Island District Court's reference to proper venue in Rhode Island in *Aguasvivas* does not contain any analysis: the Court merely notes that "The Government is not contesting that *venue* is proper in the District of Rhode Island" (emphasis added). *Aguasvivas*, 405 F. Supp. 3d at 352 n. 8. Ms. Tok's case is distinguishable from *Zhenli Ye Gon v. Holder*, 825 F. Supp. 2d 278, 279 (D.D.C. 2011) because her extradition case is closely related to an already pending case, and because unlike the order in *Zhenli Ye Gon* which committed the relator to "the custody of the United States," *id.*, here the Magistrate Judge explicitly ordered that Ms. Tok "shall remain *in the*

*custody of the U.S. Marshal for this District*" (D. 16-8 at 51 (emphasis added)), making

Respondent Kyes her immediate custodian.) The government has not disputed the allegations in

Paragraphs 85-88 of the Petition that Respondent has custody over Ms. Tok and that Respondent

manages the terms and conditions of her confinement.[7]

### B.  Ms. Tok's Detention and Extradition are Unlawful

#### 1.  The Treaty Authorizes Extradition of Only Persons "being prosecuted for or…charged with an offense." Ms. Tok is Neither.

The government fails to acknowledge the full text of the Treaty and in particular its

provision on mutual assistance. Instead it urges the Court to adopt a broad reading of the term

"charged" as generally accused that the full text of the Treaty does not support. The mutual

assistance provision provides mechanisms for effecting investigations related to accused persons,

whereas the extradition portion of the treaty specifically requires that the person sought must be

"prosecuted or…charged" for the extradition to be valid. Treaty, Chapter I, Section II, Article

7(1). *See* Treaty, Chapter I, Section I, Article 1 (persons "who are being prosecuted for or have

been charged with an offense" may be extraditable). Both the plain text of the "charged"

provisions and the full text of the Treaty support the simplest and clearest interpretation: charged

means charged. No charge has issued in this case even though it has been more than a year since

the underlying incident, and Ms. Tok therefore cannot be extradited.

The government relies on a purported distinction between the noun and verb definition of

the term "charge" and asserts that Ms. Tok ignores the pertinent definition of "charge" as a verb.

(D. 16 at 12.) Ms. Tok in fact cited both definitions in her original memorandum in support of

---

[7] In the event that the Court disagrees with Ms. Tok regarding forum, Ms. Tok respectfully requests that the Court transfer the case to the United States District Court for the District of Rhode Island. The interests of justice require that Ms. Tok be afforded an opportunity to seek habeas relief and avoid outright dismissal of her sole remedy for unlawful detention without a decision on the merits.

habeas. "Charge," as a verb, is defined as "To accuse (a person) of an offense." (D. 3 at 8 (Petitioner's memo), quoting CHARGE, Black's Law Dictionary (12th ed. 2024).) The definition of charge as a noun expressly requires a "formal accusation." *Id.* This Court should consider the entirety of available definitions of the term "charge" to best assess the term's plain meaning.

To rely exclusively on a single form of the definition, as the government asks this Court to do, requires an interpretation of the term "charged" using the actual part of speech employed by the Treaty: a participle. *See* Treaty, Chapter I, Section I, Articles 1 & 7 (referring to persons who "have been charged" and person who "is charged," the past participle form of "charge"). The participle form inherently relies on the definition of charge as a verb.[8] When interpreting the participle form of "charging" in *Vitkus v. Blinken*, the Fourth Circuit interpreted the term read to exclude documents accusing a suspect of an offense from the definition of "charging" documents. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). That the treaty in *Vitkus* required a specific charging document does not change the applicability of the Fourth Circuit's interpretation of "charging," a participle, to this Court's reading of the Treaty's use of the term "charged," which is also a participle. *Vitkus*' holding followed from its interpretation of the text of the treaty about the meaning of the participle of "charge." *Vitkus*, 79 F.4th at 362 (treaty interpretation "begins with its text") and 363 (charging document requirement is proof treaty required "to establish that an individual has been 'charged' with a crime"). The Fourth Circuit's conclusion was simple and rooted in the text: accusatory documents are not ones that charge. *Id.* at 361-63.

---

[8] *See* Merriam-Webster, *Participle definition & meaning*. Merriam-Webster. https://www.merriamwebster.com/dictionary/participle ("a word having the characteristics of both *verb* and adjective") (emphasis added); Dictionary.com, *Participle*, Dictionary.com https://www.dictionary.com/browse/participle ("a form *derived from a verb*, used in English as an adjective…") (emphasis added).

While the government attempts to distinguish the *Vitkus* decision by arguing that the treaty at issue in that case was materially different than that before this Court, it ignores the full text of the Turkish Treaty, which includes both extradition and mutual assistance provisions. (D. 16 at 16.) None of the cases cited by the government in support of a broader reading of the term "charged" interpret a treaty that also contains a mutual assistance provision. (D. 16 at 11-17. *See* D. 3 at 12-13 n.10 (listing treaties interpreted).)

Even if this Court were to interpret the term "charged" to include informal accusations, the documents submitted by Türkiye, which clearly indicate the process is in an investigatory stance, cannot satisfy that definition. (*See* D. 16-3 at 53 (prosecutor's office to be contacted "for taking her statement" after which arrest "will be evaluated"), 56 ("statement shall be taken" and then it will be "evaluated whether she will be arrested")). The government does not dispute that courts that have concluded that "charged with" treaty language does not require formal charges have found that only statements that a person either has been actually charged or is "wanted for prosecution" satisfy the treaty language. (D. 16 at 11-17.) *See Emami v. U.S. Dist. Ct. for N. Dist. of California*, 834 F.2d 1444, 1449 (9th Cir. 1987) (German government's statement that person "is wanted for prosecution" satisfied treaty permitting extradition of "charged" individuals); *Republic of France v. Moghadam*, 617 F. Supp. 777, 781 (N.D. Cal. 1985) (treaty language referring to persons "charged with" a crime was satisfied by arrest warrant and "a statement by the [foreign nation] that [the person sought] has been charged with violating [foreign] laws"). The government only asserts in response that Türkiye has made qualifying statements in this case. (D. 16 at 17.)

To support the notion that "Türkiye has unequivocally stated its intent to prosecute" Ms. Tok, the government cites four statements in the extradition request, none of which actually state

an intent to prosecute. (D. 16 at 17.) First, the government cites a statement that Ms. Tok

"committed the offences." (D. 16 at 17, quoting D. 16-4 at 16.) This is an allegation, not a

statement of intent. Second, the government cites a statement that "there is no legal situation,

preventing the filing of a public lawsuit." (D. 16 at 17, quoting D. 16-4 at 24.) This, once again,

is not a statement of intent to prosecute, but a description of whether or not there are obstacles to

prosecution. Specifically, in context, this statement refers to the Turkish government's argument

that Ms. Tok could be prosecuted for the Article 283 Protecting an Offender Charge, even

though she cannot be punished for such offense under Turkish law due to her status as T.C.'s

mother. (D. 16-4 at 24.) Third, the government cites a statement that "the defendant must be

tried." (D. 16 at 17, quoting D. 16-4 at 24.) Not only is this not a statement of intent, but it is

taken out of context: this statement, too, is part of the Turkish government's argument that Ms.

Tok can be prosecuted for Article 283, and is a description of whether "the reasons for personal

exemption from punishment will constitute an obstacle to the principle of double criminality."

(D. 16-4 at 24.) Finally, the government cites, only in part, a statement that in full reads:

> In terms of the offence of concealing, altering, and destroying the evidence of the
> offense; the fact that the evidence is linked to the evidence within the scope of the
> offence of protecting the offender, makes the extradition of Eylem Tok necessary for the
> Turkish judicial authorities *to evaluate her legal status* and to carry out investigation and
> prosecution about her due to both offences.

(D. 16-4 at 25 (emphasis added); *see* D. 16 at 17.) This is a statement regarding whether Ms. Tok

can be extradited on either charge because the "evidence is linked" to the other. Notably, the

statement indicates an intent to "evaluate her legal status"—language the government omits—

before any next steps are made. Though prosecution is referenced, it is contingent on that

evaluation; the Turkish government has not indicated an intent to prosecute Ms. Tok. Tellingly,

nor has it initiated prosecution in the year that has passed since the underlying incident. In fact,

the only intent that the Turkish government has repeatedly stated is an intent to investigate Ms. Tok. (*See* D. 3 at 10 (citing underlying documents' repeated statements referring to investigation).)

The Second Circuit analyzed a similar issue of government statements regarding an intent to prosecute in *Sacirbey v. Guccione*, 589 F.3d 52, 68 (2d Cir. 2009). There, as here, the documents submitted by the foreign government, Bosnia, "confirm[ed] only that [the petitioner] is under investigation in Bosnia, not that the Bosnian government seeks to prosecute him." *Id.* The Court specifically assessed a statement that "the Court of Bosnia and Herzegovina will proceed if the request for extradition would be approved," but determined that the petitioner was only wanted for criminal investigation, not prosecution, because the statement "does not hint at *how* the Bosnian court will proceed—that is, whether by immediate prosecution or by permitting the prosecutor to undertake further investigation" (emphasis in original). *Id.* At best, the Turkish government's statements here evidence a similar ambiguity, and they certainly do not support an interpretation that Türkiye intends to proceed with "immediate prosecution." *Id.* (*See* D. 16-4 at 25 (Türkiye will "evaluate [Ms. Tok's] legal status" after extradition).) *See also Sacirbey*, 589 F.3d at 68-69 ("[A]n investigation of Sacirbey *in the prosecutor's office*—rather than prosecution in court—is pending in Bosnia. Based on our review of this evidence, we are dubious that Bosnia seeks to prosecute Sacirbey for a crime" (emphasis in original)).

The government makes no response to the fact that the mutual assistance portion of the Treaty is the appropriate mechanism for seeking Ms. Tok's statement except to reiterate its assertion, not rooted in the underlying documents, that Türkiye intends to prosecute Ms. Tok. (D. 16 at 17 (stating only that Ms. Tok's reference to mutual assistance provision is "misplaced").) Yet, at the same time, the government argues that "the Turkish prosecutor should not be

penalized for wanting to gather all relevant evidence—including Tok's statement—before initiating formal charges." (*Id.*) What the government claims the prosecutor should have access to under the extradition chapter for the Treaty—Ms. Tok's statement—is *precisely* the purpose of the mutual assistance portion of the treaty. Treaty, Chapter II, Section I, Article 21 ("mutual assistance shall include…effecting the taking of testimony or statements of a person"). The drafters included this provision on mutual assistance and separated it from the chapter on extradition; Türkiye cannot collapse the mutual assistance portion of the Treaty into grounds for extradition. *E.g.*, *Yoo v. United States*, 43 F.4th 64, 71-72 (2d Cir. 2022) (court interpreting treaty should "avoid readings that render…language surplusage or redundant") (quoting *Sacirbey*, 589 F.3d at 66-70 (2d Cir. 2009)); *Yoo*, 43 F.4th at 71-72 (court may consider "negotiation and drafting history of the treaty" and "postratification understanding") (quoting *Medellin v. Texas*, 552 U.S. 491, 507 (2008)). The government has not identified—and undersigned counsel is not aware of—any Treaty including both extradition and mutual assistance provisions that either adopts a broad reading of the term "charged" or that permits extradition for the taking of a statement by a prosecutor. The plain text of the Treaty is clear that what Türkiye seeks—to evaluate Ms. Tok's legal status and take her statement (D. 16-3 at 53, 56; 16-4 at 25)—can be effected only under the mutual assistance provision, not through extradition.

### 2. Türkiye Has Not Satisfied the Arrest Warrant Requirement

Contrary to the government's assertion (D. 16 at 18), this Court need not defer blindly to its claim that the documents submitted with the extradition request are arrest warrants, especially where, on their face, they expressly state that Ms. Tok's arrest is still to be evaluated. (D. 16-3 at 53, 36.) In considering a petition for a writ of habeas corpus arising out of an extradition proceeding, this Court is not "expected to wield a rubber stamp," but instead has a "duty to

ensure that the applicable provisions of the treaty and the governing American statutes are complied with" (alterations omitted). *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011), quoting *Sacirbey*, 589 F.3d at 63 (denying extradition where documents provided did not satisfy treaty's arrest warrant requirement).

In *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016), the court analyzed both the foreign nation's criminal code and the Black's Law Dictionary definition of an arrest warrant to conclude that the submitted documents "include[d] the elements of an arrest warrant" and therefore satisfied the warrant requirement. Notably, the Sixth Circuit in *Basic* relied on the definition of an arrest warrant external to the foreign government's submission, which defined an arrest warrant as including "a direction that 'a law-enforcement officer…arrest and take a person into custody.'" *Id*. (quoting *Black's Law Dictionary* 1818-19 (10th ed. 2014)). The documents submitted in this case include no such direction: they contemplate only an evaluation of Ms. Tok's arrest after taking her statement and no direction to take her into custody. (D. 16-3, at 53 ("arrest of the suspect for interrogation will be evaluated" after contacting prosecutor's office upon apprehension), 56 ("After her statement is taken, as it is evaluated whether she will be arrested…").)

Both in *Basic* and in a case on which *Basic* and the government rely, *Matter of Extradition of Nezirovic*, the courts analyzed foreign law and, following that analysis, decided to adopt the explanation of a statement by the foreign nation regarding the role a particular document played in their foreign law. *Basic*, 819 F.3d at 901; *In re Extradition of Nezirovic,* No. CIV.A. 7:12MC39, 2013 WL 5202420, at *14 (W.D. Va. Sept. 16, 2013) ("this court must analyze the law of Bosnia…to ensure that the requirements of the applicable extradition treaty have been satisfied"). In *Basic*, the court relied on a "document, included in the record, from the

Ministry of Justice of BiH Sarajevo, explain[ing] that [an earlier] directive to find and arrest [the petitioner]…is the Arrest warrant in this matter" (quotations and alterations omitted). *Basic*, 819 F.3d at 901. Analyzing foreign law to address a tolling issue in *Nezirovic*, the court relied on an affidavit from a Bosnian prosecutor explaining that a particular document "functions to initiate beginning of a criminal prosecution…and is sufficient to toll any statute of limitations." *Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *14. There is no such explanation in this matter; the documents are merely titled "arrest warrants" in the English translation.[9] (D. 16-3 at 53, 56.) The Turkish government does not provide any explanation of its purported arrest warrants to which this Court could defer. This Court cannot ignore the plain text of the documents and their failure to satisfy the definition of an arrest warrant and, therefore, the extradition treaty. *Basic*, 819 F.3d at 901, quoting *Black's Law Dictionary* 1818-19 (10th ed.2014); *Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *14; Treaty, Article 7 ("a request relating to a person…who has yet to be convicted shall be accompanied by…a warrant of arrest"). The government has no argument in response to the plain text of the purported arrest warrants, which do not direct arrest; it argues only that this court should defer to Türkiye's unsupported, unexplained labeling of the documents as warrants. (D. 16 at 18.) The government also makes no response to the significant difference between documents alleging violations of Article 281 and Article 283. (D. 16 at 18; D. 16-3 at 53, 56; D. 3 at 15-16 (setting out differences and the absence of reference to the Turkish arrest statute in the Article 281 document).)[10]

---

[9] Notably, in the underlying Turkish documents, the Article 281 document has a different title from the Article 283 document.

[10] This should take note not only of the differences between the warrants, but also of fact that the decision issuing the Article 281 document refers only to Article 248/5, the seizure to compel provision, and makes no reference to Article 100, the arrest provision. *See* Turkish Criminal Procedure Code, available at https://sherloc.unodc.org/cld/uploads/res/document/tur/2005/turkish_criminal_procedure_code_html/2014_Criminal_Procedure_Code.pdf. Like the

Interpreting similar treaty language to the Treaty at issue here, the Second Circuit in *Sacirbey v. Guccione* set out clearly that the requirement for an arrest warrant is necessary to the determination that a person has been charged under the broad definition of charge: "we interpret these provisions [requiring an arrest warrant to extradite a person 'charged with a crime'] to mean that the proof required under the Treaty to establish that an individual has been 'charged' with a crime is a valid arrest warrant." *Sacirbey*, 589 F.3d at 67. That court then reviewed two sets of documents in determining whether the arrest warrant requirement was satisfied. First, as the government points out (D. 16 at 18), it determined that an arrest warrant issued from a court "ousted of jurisdiction" did not satisfy the requirement because the issuing court was "no longer able to enforce" the warrant. *Sacirbey*, 589 F.3d at 67. Second—and this the government ignores (D. 16 at 14, 18)—the court analyzed whether a second set of documents could satisfy the arrest warrant requirement: "official statements indicating Bosnia's intent to prosecute." *Id*. The court concluded that "proof of such intention" also did not satisfy the arrest warrant requirement. *Id*.; *see id.* at 69 ("the Treaty requires a valid arrest warrant…that requirement is not satisfied by a demonstration of intent to prosecute"). Even assuming arguendo that the submissions in this case demonstrate an intent to prosecute Ms. Tok (which they do not—*see supra* Part I.B.1)—that intent does not cure the lack of a valid arrest warrant.

This Court cannot ignore the plain text of the documents purporting to be arrest warrants, which in fact seek only Ms. Tok's statement for further evaluation, and include no directive to take her into custody. These are not arrest warrants, and Ms. Tok cannot be extradited on their

---

courts in *Basic* and *Nezirovic*, this court should read the plain text of Turkish law to ensure that the basic obligations of the treaty are met. The fact that the Article 281 document omits any reference to the formal authority to arrest Ms. Tok only underscores what the text of the document says—there has been no judicial decision to arrest Ms. Tok for an alleged violation of Article 281.

basis. *See Basic*, 819 F.3d at 901; Treaty, Chapter I, Section II, Article 7 (request relating to person yet to be convicted "shall be accompanied by…a warrant of arrest").

> ### 3.    Ms. Tok's Arrest Violated the Fourth Amendment and 18 U.S.C. § 3184 and Her Prolonged Detention Pursuant to an Unlawful Arrest Violates Her Due Process Rights

Ms. Tok was detained in violation of the Fourth Amendment and 18. U.S.C. § 3184, and her continued detention violates her Fifth Amendment Due Process rights. The government originally sought extradition based only on the Article 283 allegation; in Türkiye's initial submission to the government, which the government relied on in seeking an arrest warrant, Türkiye failed to comply with its Treaty obligations with respect to Article 283. Türkiye specifically failed to meet its obligation to provide "the law prescribing the punishment for the offense, and the law relating to the limitation of legal proceedings or the enforcement of the penalty for the offense." Treaty, Chapter I, Section II, Article 7. That omission was material, because Ms. Tok is exempt from punishment under Article 283, and therefore not extraditable. That the submission was later amended and that Ms. Tok's detention was later reviewed by the Magistrate Judge does not make her original arrest and detention lawful. In *Parretti v. United States*, 122 F.3d 758, 771 (9th Cir. 1997), *withdrawn under the fugitive disentitlement doctrine*, 143 F.3d 508 (9th Cir. 1998), the Ninth Circuit rejected the government's argument that a later probable cause determination cured the constitutional violation created by the initial unlawful arrest. That *Parretti* was withdrawn under the fugitive disentitlement doctrine does not affect the court's reasoning in that decision, because the withdrawal was based on grounds unrelated to the court's analysis. And as the Ninth Circuit explained in *Parretti*, an unlawful initial arrest is not cured by providing supplemental information or a probable cause hearing. Moreover, the government's reliance on the Magistrate Judge's probable cause decision here is particularly

inapposite where the Magistrate Judge never found that the Article 283 charge met the Treaty requirements for extradition; the Magistrate Judge bypassed that issue, relying on the Article 281 charge to meet the Treaty's punishment requirements. (D. 16-8 at 20.) Thus, the judicial review *never* reached the fundamental problem with the initial arrest warrant—that it was issued for an offense that was not on its own extraditable. The government cannot arrest first and then create a legal basis to justify the arrest after the fact. *See Foucha v. Louisiana,* 504 U.S. 71, 80 (1992) ("[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). This Court should therefore grant Ms. Tok's petition and order her immediate release.

### 4. Ms. Tok Is Not Punishable by More Than a Year in Prison and Therefore is Not Extraditable

Ms. Tok's detention and extradition are unlawful because neither of the alleged offenses is extraditable as charged. Extraditable offenses under the Treaty are those that are punishable by deprivation of liberty for "at least a period exceeding one year or by a more severe penalty." Treaty, Chapter I, Section I, Article 2(1). Ms. Tok is not subject to such punishment under either provision charged.

The Magistrate Judge certified Ms. Tok's extradition for a violation of the Article 281 charge based only on the allegation that Ms. Tok concealed a cellphone. (D. 16-8 at 41-46 & nn. 34-35.) As Ms. Tok has noted, she is not subject to punishment on this offense for more than one year, because T.C.'s driver turned the cellphone over to the police, and that conduct reduces the punishment available to 4.8 months to a year. (*See generally* D. 3 at 21-23 (describing the statutory scheme of Article 281, the evidence, and case law applying sentencing provisions when considering extraditability).) The government suggests, relying on the Magistrate Judge, that there are disputed facts to be resolved on this point, namely whether T.C.'s driver was acting as

Ms. Tok's agent when he turned in the phone. (D. 16 at 19 (citing D 16-8 at 21-22).) But that conclusion ignores Türkiye's repeated assertions that T.C.'s driver acted as Ms. Tok's agent. (*See* D. 16-4 at 20 ("Their drivers are the people, who work under them and carry out their orders and instructions; *there is no difference between something being in the possession of TOK and being in the possession of someone working under her*." (emphasis added)); *id.* ("As a matter of fact, when the incident is evaluated as a whole, TOK acted together with *her subordinates* in general, and the behaviors of *her driver* and assistants made it easier for her to act." (emphasis added)).) To the extent Türkiye suggested a triable issue around the cellphone, it did so on a different point: still referring to T.C.'s driver as Ms. Tok's *subordinate*, Türkiye pointed to a fact that is disputed and would be at any trial—whether Ms. Tok had possession of the cellphone. (*See id.* at 20; *see also id.* at 19 (acknowledging that surveillance footage shows a different individual taking the cellphone).)

Although the Magistrate Judge bypassed the question of whether Ms. Tok can be punished for a violation of Article 283 (D. 16-8 at 20), the government continues to insist—in defiance of the Treaty, Article 283, and Turkish procedural law—that Ms. Tok is separately extraditable for this offense. (*See* D. 16 at 20.) As T.C.'s mother, Ms. Tok is statutorily exempt from any punishment. (D. 16-3, at 22 (providing text of Article 283(c)).) The suggestion that she is extraditable because she can be investigated or prosecuted for this offense is wrong; the Treaty requires that she be *punishable*. Treaty, Chapter I, Section I, Article 2(1). (*See* D. 16 at 20; *see also* D. 3 at 20 n.5.) And the suggestion that Ms. Tok's status as T.C.'s mother is an affirmative defense is contrary to Turkish law and procedure. Turkish law does not treat determination of Ms. Tok's status as T.C.'s mother as an affirmative defense. Ms. Tok does not bear any burden to show the undisputed fact that she is T.C.'s mother; that fact is conclusively established by

reference to an authoritative government database, and the relevant extract from that database was included with the extradition request. (*See* D. 16-3 at 57; *see also* Ex. 1, T.C. Vital Record.) Nor does the Turkish government suggest that she bears any such burden or refer to her status as an affirmative defense. (D. 16-4, at 24 (referring to parent status as "personal exemption" rather than affirmative defense, and not discussing burden to show qualification).) *Cf.* 2 McCormick on Evid. § 346 (8th ed.) ("The term affirmative defense is traditionally used to describe the allocation of a burden, either of production or of persuasion, or both, to the defendant in a criminal case."); *Patterson v. New York*, 432 U.S. 197, 210-11 (1977) (discussing defendant's burden to prove affirmative defenses). Rather, under Turkish criminal procedure, "no need to inflict punishment' is a potential case outcome that is distinct from an acquittal based on an affirmative defense. *See* Ex. 2, Art. 223(4)(b) of Turkish Criminal Procedure (where there are grounds for a personal exemption, "a judgment related to 'no need to inflict punishment' shall be rendered"); *cf.* Art. 223(2)(d) of Turkish Criminal Procedure (explaining the process for acquittals based on affirmative defenses).[11]

Because neither of the alleged offenses meets the Treaty's requirement that Ms. Tok actually be punishable by deprivation of liberty in excess of one year, the certification of extraditability should be vacated and Ms. Tok should be discharged.

---

[11] The Turkish government misrepresents this provision of Article 223(4) in its supplemental memorandum, summarizing rather than quoting the statutory language, and in doing so changing the mandatory term "shall" to "may," and adding commentary, not included in the text of the Article, or consistent with its text, that the judge has discretion over these decisions. (*Compare* D. 16-4, at 24 ("In the paragraph 4 of [Article 223] ... in cases where the perpetrator is not sentenced, it is stipulated that a decision of not to impose a penalty *may* be rendered") (emphasis added), *with* Ex. 2, Article 223(4) ("In the following cases, a judgment related to 'no need to inflict punishment' *shall* be rendered") (emphasis added).)

5.    **The Article 281 Allegations Do Not Provide a Valid Basis for Extradition**

Violation of Article 281 requires a showing that evidence was destroyed, altered or concealed. The cellphone at issue is not evidentiary, as the Turkish government has repeatedly admitted through its statements and its conduct. To conclude otherwise, the government ignores Türkiye's repeated statements equivocating about the cellphone's use as evidence (D. 16-3 at 8; D. 16-4 at 16, 19, 20, 2; *see also* Ex. 3, Eyupsultan police report, at 11)[12] and an affidavit from a Turkish lawyer who has examined the record evidence in the Turkish case against T.C. and confirms that the cellphone is not present (Ex. 4, Affidavit of Atty. Çakmak).[13] Because the cellphone at issue is not evidentiary, Ms. Tok's conduct would not violate Article 281. (*See generally* D. 3 at 27-30.)

Although the certificate of extraditability was *not* based on allegations that Ms. Tok removed T.C. or his friends from the scene of the crash or prevented the government from testing T.C. for alcohol—and the Magistrate Judge specifically declined to reach probable cause on those allegations (D. 16-8 at 21-46 & nn. 34-35)—the government continues to press those unsupported allegations (D. 16 at 25; *see also* D. 16 at 16[14]). While two minors left the scene before emergency services had arrived, authorities were at the scene *before* Ms. Tok picked up T.C. and two other minors. (D. 16-3 at 25, 28, 30, 38, 40;  Ex. 3, at 18-19.) No minors could

---

[12] The Magistrate Judge accepted this police report as explanatory evidence that could be considered for extradition. (D. 16-8 at 44 n.35.)

[13] To clarify, there are two Turkish affidavits. The government acknowledges—but dismisses—the Türay affidavit from an expert on Turkish law, Ex. 5; the government has consistently ignored the Çakmak affidavit concerning the state of the evidence in T.C.'s case, Ex. 4.

[14] In a change to the ever-evolving allegations, the government now appears to be pressing the groundless assertion that Ms. Tok's actions "concealed evidence of who was driving the car" (D. 16 at 16), a claim that has not previously been advanced and is contradicted by the fact that T.C. remained at the accident scene with victims, bystanders, and first responders.

have been questioned at the scene pursuant to Turkish law. (Ex. 5, Affidavit of Dr. Türay, at 3-5 & n.11.) Indeed, no minors were sought for questioning until later after a victim died at the hospital. (Ex. 3, at 8, 9, 11-19; D. 5-2, 108-14, 121-22.) The allegation that Ms. Tok moved T.C. is an allegation that she violated Article 283; that Article's exemption on punishment cannot be circumvented by alleging a violation of Article 281 based on the same conduct. (Ex. 5, at 3 & n.7, 6 & n.17.) Finally, there is no evidence in the record that T.C. was under the influence.[15]

The Magistrate Judge did not rely on these allegations in issuing a certificate of extraditability and as such, they are not the basis for Ms. Tok's detention and therefore are not before this Court.[16]

### 6.    The Conduct Alleged To Violate Article 281 Is Distinct From The Conduct Alleged to Violate 18 U.S.C. § 1512(b)(3)

The government does not squarely address Ms. Tok's argument that the Magistrate Judge found probable cause that Ms. Tok violated Article 281 by concealing the cellphone, but found that different conduct (allegedly lying to the security guards) would have violated 18 U.S.C. §

---

[15] None of the nine minors questioned mentioned the presence or use of alcohol. (*See* D. 16-3 at 24-30, 37-38; Ex. 3, at 11-19.) Those victims who were able to give statements about the accident made no reference to any individual on the scene appearing to be under the influence of alcohol. (Ex. 3, at 9-11.) The bystander who provided a police statement reported multiple interactions with teenagers at the scene and did not report that anyone appeared to be under the influence. (D. 16-3 at 39, 40; *see also id.* at 25, 38 (confirming that bystanders arrived on the scene while D.O.O. and A.K.—the minors who left the scene with T.C.—were still present).) There are no statements from emergency responders indicating that they saw evidence of alcohol use. Police reviewed surveillance footage of the four minors in T.C.'s vehicle—who got out of the car while another vehicle stopped to refuel shortly before the accident—and have not suggested that the surveillance footage provides any reason to believe that T.C. was under the influence. (Ex. 3, at 25-26.)

[16] For a more complete analysis of the underlying evidence regarding Ms. Tok's decision to pick up her son and two others at the scene of the accident and the complete absence of any evidence suggesting that alcohol was a factor in the accident, *see generally In re Extradition of Eylem Tok*, Docket No. 24-mj-01365-DLC, Dkt. No. 128-1, 4-8 (allegations regarding moving the minors and alcohol), 19-21 (conduct would not violate Article 281), 31-35 (no probable cause regarding allegations of removing minors to prevent questioning or alcohol testing).)

1512(b)(3). (*See* D. 16-8 at 28 ("Tok lied to and misled the security guards…. She *then* took the cellphone… and concealed it…" (emphasis added).) The government attempts to elide this difference by asserting that lying to the security guards in order to obtain the cellphone *was* concealing the cellphone. (D. 16 at 22 & n.8.) But a person cannot conceal evidence if they have no control over it. If Ms. Tok's crime under United States law were to mislead the security guards so that they would not turn the phone over to police, that crime would have been complete before Ms. Tok allegedly obtained the phone. *See United States v. Santonastaso*, 100 F.4th 62, 72-74 (1st Cir. 2024) (upholding conviction where defendant called witness to encourage him to lie to investigators, but witness did not do so). At the point in time when she spoke to the security guards, Ms. Tok had not concealed anything. Only after Ms. Tok got the phone is she alleged to have concealed it by taking it and leaving it in the car, after which the driver returned it to police (apparently intact) a few days later. Because these two actions are conceptually and temporally distinct, they cannot establish that one alleged action by Ms. Tok would have satisfied the dual criminality requirements of the Treaty.

### 7. There Is No Allegation That Ms. Tok Impaired the Availability or Integrity of Witness Testimony as Might Support a Violation Of 18 U.S.C. § 1512(c)(2)

The government's suggestion that Ms. Tok's conduct could have violated 18 U.S.C. § 1512(c)(2) by impacting "witness testimony" is incorrect because there is no claim that Ms. Tok impaired the availability or integrity of witnesses' testimony. The government asserts that Ms. Tok would have violated this statute by having T.C. and two friends driven away from the crash site, although both friends gave statements to police the next day and both identified T.C. as the driver. (D. 16 at 23-24; D. 16-3 at 24-26, 37-38.) The Magistrate Judge did not address the government's contention, and it is not the basis for the certification of extraditability; therefore,

even if the government's assertion were accurate, Ms. Tok cannot be extradited on the theory of dual criminality for impairing witness testimony. (D. 16-8 at 44-45 n.35.)

Although impairing the integrity or availability of "witness testimony" could theoretically be a Section 1512(c)(2) violation, the example cited in *Fischer* indicates that this is not that case. *See Fischer v. United States*, 144 S. Ct. 2176, 2186 (2024). The *Fischer* Court, in explaining its reference to impairing witness testimony, cited *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007), in which the defendant falsified documents, hired a lawyer to represent a grand jury witness, and used that lawyer to "coach" the witness by feeding him false testimony in an effort to obstruct the grand jury. In contrast, there is no evidence that Ms. Tok caused anyone to give false testimony, nor that she impeded the availability of witness testimony. The allegation is merely that she "remov[ed] T.C. and two of his friends from the crash scene." (D. 16 at 24.) All of the witnesses gave statements to investigators (except T.C., who would not have been required to speak with authorities based on self-incrimination principles).[17] Ms. Tok has found no case where causing a witness to give a statement to police a day later, rather than on the scene, gave rise to liability under Section 1512(c)(2). Because the Magistrate Judge did not find probable cause for an offense on this theory, the Magistrate Judge did not rely on this argument to support dual criminality, and these allegations would not be sufficient to establish a violation of Section 1512(c)(2) in analogous circumstances in the United States, this Court should hold that Section 1512(c)(2) does not support dual criminality or Ms. Tok's extradition.

---

[17] *See* Constitution of the Republic of Türkiye, Article 38/5, *available at* https://www.anayasa.gov.tr/media/7258/anayasa_eng.pdf ("No one shall be compelled to make a statement that would incriminate himself/herself or his/her legal next of kin, or to present such incriminating evidence.").

### 8. State Law Cannot Be Used To Establish Dual Criminality Because Article 281 Is Not Listed in the Appendix to the Treaty

Ms. Tok is being held pursuant to the Magistrate Judge's order, which did not determine that it could or would consider state law for establishing dual criminality under the Treaty (D. 16-8 at 26-31); for that reason alone, state law is irrelevant at this stage. However, even if this Court did consider the question raised by the government (D. 16 at 22-25), it would have to conclude that the government cannot rely upon state law to support dual criminality for the Article 281 offense. Article 2, Section 1(b) of the Treaty permits consideration of "the laws of… the Requested Party," as opposed to Section 1(a)'s reference to "the federal laws of the United States," only for "[o]ffenses listed in the Appendix to this Treaty." (Treaty, Art. 2, § 1(b).) By its terms, the Treaty requires the Court to look at the offense, that is, the statute under which Ms. Tok is allegedly charged, and compare it to the list of crimes in the Appendix. The drafters of the Treaty could have provided that the court would look to the conduct underlying the offenses, but they did not. *See Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) (interpretation of treaty must rest upon its text). Article 281 prohibits, as relevant here, concealing evidence. It does not include any element of misleading witnesses or impeding investigators. In contrast, item #19 of the Appendix applies to "Unlawful obstruction of judicial proceedings or proceedings before governmental bodies or interference with an investigation of a violation of a criminal statute, *by influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator*" (emphasis added). Even assuming that concealing evidence would necessarily constitute interference with a criminal investigation, which is far from clear, item #19 is very specific. An offense only satisfies the criteria in item #19 if the interference with an investigation is by certain means such as witness intimidation or impeding a particular investigator. Because Article 281 does not require these

means, it is not an offense listed in the Appendix. The government's interpretation would read the second half of item #19 out of the Appendix. "In interpreting both statutes and treaties, courts seek to avoid readings that render statutory language surplusage or redundant. But where the language of a treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." *Yoo v. United States*, 43 F.4th 64, 71-72 (2d Cir. 2022) (quotation marks and citations omitted). In addition, the allegations are that Ms. Tok violated Article 281 by concealing the cell phone, not that she impeded any named and "duly authorized criminal investigator." The core of Türkiye's theory is that Ms. Tok allegedly misled the security guards in order to obtain the phone, which she then concealed; the government's attempt to shoehorn this conduct into item #19 reverses the chronology and misstates the asserted basis for the offense. Because neither the Article 281 offense nor the alleged conduct underlying it meets the terms of item #19, the government cannot rely on state law for dual criminality.

### 9. Even If State Law Is Relevant, the Alleged Conduct Would Not Be a Violation of Mass. Gen. Laws c. 268, §§ 13B or 13E

Although this Court should not consider the applicability of Massachusetts law both because doing so would be unjustified under the Treaty and because it was not addressed by the Magistrate Judge, even if it were to consider the state statutes identified by the government, they would be unavailing. Massachusetts General Laws Chapter 268, § 13B, is a witness intimidation statute closely analogous to 18 U.S.C. § 1512(b)(3). Ms. Tok's alleged conduct would not violate this statute for similar reasons to its federal counterpart. It is not alleged that Ms. Tok "(1) willfully; (2) misle[]d, intimidate[d], or harass[ed]; (3) a witness or potential witness…" in order to (4) impede or interfere with a criminal investigation. *See Commonwealth v. Nordstrom*, 179 N.E.3d 593, 100 Mass. App. Ct. 493, 499-500 (2021). To the extent that the government asserts Ms. Tok somehow impeded a police investigation, Massachusetts courts require that even false

statements must be able to "reasonably… lead investigators to pursue a course of investigation materially different from the course they otherwise would have pursued" in order to qualify as "misleading" under § 13B. *See Commonwealth v. Paquette*, 62 N.E.3d 12, 475 Mass. 793, 801 (2016); *Commonwealth v. Condon*, 162 N.E.3d 76, 99 Mass. App. Ct. 27, 38-40 (2020). The security guards Ms. Tok allegedly misled were not witnesses or potential witnesses in the prosecution of T.C., as they did not observe the accident and never saw T.C.; misleading them did not and could not have impeded or interfered with a criminal investigation. And nothing Ms. Tok allegedly said or did meaningfully impacted the police investigation of the accident; delaying by a matter of hours the taking of witness statements did not lead investigators on anything approaching a "wild goose chase." *See Paquette*, 62 N.E.3d at 18. The government's suggestion that Ms. Tok "le[]d investigators away from pursuing enhanced charges against T.C. for driving under the influence and from seeking an earlier arrest warrant" (D. 16 at 24-25) is unsupported by any evidence that police would have done anything materially different if D.O.O. and A.K. had remained at the crash site rather than giving statements the next day, or any evidence of alcohol contributing to the crash. Even destroying evidence to prevent police from obtaining it does not violate § 13B. *See Commonwealth v. Tejeda*, 73 N.E.3d 290, 476 Mass. 817, 820-21 (2017). Moving T.C. and thereby rendering an alcohol test unavailable would not violate this statute as construed by the Supreme Judicial Court in *Tejeda*, where the defendant's action of rendering a bag of supposed heroin unavailable for testing by swallowing it was found insufficient to support a charge under § 13B. *See id.* Similarly, temporarily delaying when the police were able to access the cell phone would not violate the statute as interpreted in *Tejeda*.

Meanwhile, General Laws Chapter 268, § 13E, punishes one who "alters, destroys, mutilates, or conceals *a record, document, or other object*… with the intent to impair the record,

document or object's integrity or availability for use in an official proceeding." (emphasis added). Like 18 U.S.C. § 1512(c), this statute applies only to documents or objects, and not to people. Moving T.C. and the other children therefore could not violate § 13E. There is no allegation that Ms. Tok altered the contents of the cellphone or had any means to access the contents of a stranger's iPhone, and the cellphone was made available to police. *Contrast Commonwealth v. Martinez*, 158 N.E.3d 63, 98 Mass. App. Ct. 545, 546 (2020) (defendant asked coworker to throw evidence in the river). For much the same reasons as the federal cognate, Ms. Tok's alleged conduct would not violate Mass. Gen. Laws c. 268, § 13E.

## II.    CONCLUSION

For the foregoing reasons, Ms. Tok respectfully requests that the Court deny the government's Motion to Dismiss or Transfer and issue an order granting her Petition, revoking the Certification and Committal for Extradition, and directing the immediate and permanent discharge of the conditions of release imposed on her in connection with the extradition case, and such other and further relief as the Court deems just and equitable.

Respectfully submitted,
EYLEM TOK,
By her attorneys,

/s/ Jennifer M. Herrmann
Emma Quinn-Judge (BBO #664798)
David A. Russcol (BBO #670768)
Jennifer M. Herrmann (BBO # 708231)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
equinn-judge@zalkindlaw.com
drusscol@zalkindlaw.com
jherrmann@zalkindlaw.com

Dated: April 14, 2025

## CERTIFICATE OF SERVICE

I, Jennifer M. Herrmann, hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jennifer M. Herrmann
Jennifer M. Herrmann